The judgment under appeal is affirmed.

IN THE MATTER OF THE APPEAL FROM THE DECREE OF THE ORPHANS COURT OF THE COUNTY OF BERGEN, ADMITTING TO PROBATE A CERTAIN PAPER WRITING AS THE LAST WILL AND TESTAMENT OF CHRISTOPHER J. THOMSON, DECEASED.

Superior Court of New Jersey
Appellate Division

Argued May 23, 1948—Decided June 8, 1949.

Before Judges JACOBS, EASTWOOD and BIGELOW.

*Mr. Seymour A. Smith (Messrs. Hein & Smith,* attorneys) argued the cause for the appellant.

*Mr. Louis A. Mounier, Jr.,* argued the cause for the respondent.

The opinion of the court was delivered by

JACOBS, S. J. A. D.   This is an appeal from a decree of the Orphans Court of the County of Bergen admitting to probate the will of the decedent Christopher J. Thomson dated October 25, 1943.

The decedent, a retired policeman, married the appellant Adele L. Thomson in 1933.   He was 61, she was 50 years of age, and it was the second marriage for each.   She testified that they lived happily until June, 1941, when she noticed changes in his general behavior.   He became untidy, took less interest in his home, and made accusations about his wife and her family.   His condition became progressively worse and she "thought that he was mentally ill."   In June, 1942, she was told by her husband's physician, Dr. George Levitas of Westwood, that he had a stroke, although he was able to leave his bed after several days.   She further testified that on June 29, 1942, he was "exceedingly ugly" and threatened her and on the following day, at the suggestion of Dr. Levitas, she telephoned the Westwood police department which arranged for his transfer to the psychopathic ward at Bergen Pines.   He was later committed to the State Hospital at Greystone Park by order of temporary commitment dated July 3, 1942, and by final order of commitment dated September 11, 1942.

At the time of his commitment, his illness was diagnosed as "Psychosis with Cerebral Arteriosclerosis." Although his arteriosclerotic condition remained, it is clear that after his admission to Greystone, there was considerable improvement in his mental condition and general behavior. On September 12, 1942, he was visited at Greystone by his sister Elizabeth Thomson and his nephew Donald Kennedy. Mr. Kennedy testified that the decedent was able to carry on a normal conversation and requested that his wife be informed that he "was completely recovered" and steps should be taken to have him released. Thereafter, in the company of Miss Thomson, Mr. Kennedy visited his wife and "asked her if there wasn't some way that she could get him out of Greystone," and in response, "She told us that she didn't want to get him out of Greystone, that when he had been home he had been a very sick man, that she had been doing 24 hours duty as a nurse and that if she brought him home that she would have to repeat that all over again."

On September 15th Mr. Kennedy and Miss Thomson again visited the decedent at Greystone, told him about their conversation with his wife, and he asked that a lawyer be obtained for him. Mr. Kennedy then consulted Mr. Louis A. Mounier, Jr., an attorney-at-law, who, in the company of Mr. Kennedy, visited the decedent on September 19, 1942. He described the decedent on that date as a man "who was able to and who did carry on a normal, rational conversation with me, in which he answered intelligently and knowingly all the questions that I put to him." On the same day Mr. Mounier talked with Dr. Dredge, a staff physician at the hospital. On September 26, 1942, he again visited the decedent and talked with Dr. Collins.

On September 21, 1942, Dr. Dredge presented the decedent for parole and the report was "unanimous for parole to live with sister." On September 28, 1942, Dr. Dredge again presented the decedent for parole and the report was "unanimous for parole to live with wife." On October 1, 1942, the decedent was released and returned to his home. In the meantime, Mr. Mounier had served notice of an application

before the Bergen County Court of Common Pleas for an order vacating the order of commitment and later served a petition that the physicians at Greystone re-examine the decedent and report their findings as to whether he had been restored to reason.

On October 7, 1942, Dr. Dredge presented the decedent for discharge and the report was "unanimous for discharge as recovered." On November 24, 1942, the Bergen County Court of Common Pleas, after reciting that the medical superintendent at Greystone had certified that the decedent was discharged, as recovered, decreed that he had "been restored to reason." See *R. S.* 30:4–120. Thereafter, the decedent lived with his wife at their home in Westwood, visited his nephew's home in the Bronx, New York, every few months, and rarely saw his sister.

The decedent's wife testified that even after his return from Greystone and until his death on January 6, 1946, his conduct was strange and his attitude hostile. Dr. Collins, in response to a hypothetical question, expressed the view that the decedent was suffering from "an insane delusion and he couldn't comprehend his wife as the natural object of his bounty." On the other hand, Dr. Levitas testified that he treated the decedent in 1942 and 1943, examined him on various occasions, including August 6 and November 1, 1943, and "saw nothing about his condition to excite my analysis of a mental disturbance or I should have recognized it, having known him for a long time and being in practice this many years I recognize very readily."

The decedent's attorney Mr. Mounier testified that in 1942 and 1943 he saw the decedent professionally and socially; in his opinion he was normal in every respect; the decedent came to his office on October 18, 1943, with instructions for the preparation of his will; and at that time the decedent answered questions and conversed intelligently and "was as rational a man of his age as I can imagine." Mr. Mounier told the decedent to return on October 25th and on that date the will, which disinherited the wife and named the decedent's sister and nephew as beneficiaries, was duly executed.

██ The wife contends that the decedent's action was the result (1) of undue influence by the sister and nephew, and (2) insane delusions as a result of which he was unable to comprehend his wife as the natural object of his bounty. With respect to the first contention, the lower court concluded that there was no undue influence and pointed out that for over a year prior to the execution of his will the decedent lived at home with his wife, rarely saw his sister, and only occasionally visited his nephew. There was no testimony suggesting that during this period there was any interjection by the sister or nephew into his affairs or any discussion relating to his property or his testamentary disposition thereof. We are satisfied from the evidence that the decedent, at the time of the execution of his will, was aware of what he was doing, intended the consequences of his act, and was not the subject of any influences by others which destroyed his free agency or amounted to "moral or physical coercion." See *In re Skewis Will*, 2 *N. J. Super.* 114, 64 *A.* 2d 892, 984 (*App. Div.* 1949).

██ With respect to the wife's second contention, we are likewise in agreement with the lower court's determination that at the time of the execution of his will the decedent did not suffer from insane delusions which deprived him of testamentary capacity. The evidence indicates that he had regained his mental faculties by October, 1942, and was in possession of them when he executed his will a year later. It may properly be inferred that, rightly or wrongly, he believed that his wife did not wish his return at a time when his behavior warranted his release from Greystone. He evidently continued in this belief until the execution of his will and, indeed, until his death. It cannot be said that this belief was, within the decided cases, an "insane delusion" which deprived him of testamentary capacity. See *Middleditch v. Williams*, 45 *N. J. Eq.* 726 (*Prerog.* 1889); reversed on other grounds, 47 *N. J. Eq.* 585 (*E. & A.* 1890); *In re Haness' Estate*, 98 *N. J. Eq.* 645 (*Prerog.* 1925). In the oft-cited case of *Middleditch v. Williams, supra,* the court pointed out that:

"* * * where a testator is induced, by false evidence or false statements, to believe a fact to exist which does not exist, or where, in consequence of his faith in evidence which is true, but which is wholly insufficient to prove the truth of what he believes, he believes a fact to exist which in reality has no existence; his belief may show want of discernment, that he is overcredulous and easily duped, or that he lacks power to analyze and weigh evidence, or to discriminate between what is true and what is false, but it furnishes no evidence whatever that his mind is diseased. His belief may show lack of judgment or want of reasoning power, but not that his mind is unsound."

The testimony of the sister and nephew was that his wife declined to cooperate with them in obtaining his release and the record contains no express denial. In any event, the fact is that his release was brought about through their action rather than any efforts on her part. In the light of these circumstances, his preferment of his sister and nephew and rejection of his wife cannot be said to have been the product of a disordered mind necessitating the invalidation of his will.

The decree of the lower court is affirmed.